Worsley and another v. The Second Municipality of New Orleans.

---

SAME CASE—ON AN APPLICATION FOR A RE-HEARING.

*Eustis*, for a rehearing. That the municipalities had not even the semblance of authority to impose this tax, must be conceded.

The court say, that if their aid had been invoked, " *re integrâ*, to prevent this *exaction, it is probable*, we should have thought our-selves authorized to arrest the arm of the municipal authorities, as without sufficient and legal authority to *levy and coerce* the payment of such a tax."

The court say, *it is probable ;* but is it not certain ? Would it not have been a matter of duty on the part of our judicial au-thorities, under our free institutions, to have stayed the arm of the spoliator, to have prevented this extortionate exaction, and to have protected the property of the citizen ? What court, un-der a government of laws, could have hesitated in the perform-ance. of such an act of justice ? There has not been exhibited the least color of authority to impose this tax. Nay, its imposi-tion is not only prohibited by law, but the receiving the money even as a compensation is a high offence, so expressly declared by statute, and punished as such. " Any person who shall be convicted of having *received any compensation* for the land-ing of any embarcation before his land, or for any other use permitted by the laws of this territory, which provide that the shores of navigable rivers shall remain free for the common use of all men, shall, for each contravention of that kind, be fined in a sum not less than five hundred dollars : *provided*, that the pre-sent provision shall not be applicable to the duties which corpo-rations of cities, or towns have a right to establish in their ports." Act of Feb. 10th, 1808. 1 Moreau's Dig., Verbo *Levées*.

The corporations of New Orleans have a right to impose taxes, or wharfage duties, on the vessel or water craft, but not on the goods landed. They pay one duty already ; the expenses of the vessel are borne by the freight, which is increased as du-ties on it are augmented. The exaction of any other tax, than the wharfage dues of the vessel, is a palpable violation of this law. Any compensation for any use of the bank of the river, is prohibited, and the receiving of it is an offence. The defen-dants are forbidden to receive any remuneration, direct or indi-rect ; and the defendants' case is weakened by the supposition of the court, that the plaintiffs knew when they paid the tax, that it was in the nature of a remuneration, for that very remu-neration it was criminal to receive. Of the knowledge and in-

tention of the plaintiffs, when they paid the tax, it is submitted to the court, there is no evidence.

We have then the case of corporations, under the pretence of a lawful authority, and under the forms of municipal legislation, in derogation of public right and of private right, in violation of a penal statute, aided by their officers, and with their whole corporate power and influence, exacting money from the citizen. The citizen yielding to this array of adverse authority, pays it. It is admitted that the pretence is false, that there is no color of right in the exaction. Can the citizen recover his money back? Can he have redress against the spoiler, is the question before the court? If there be a subject on which it might be supposed there could be no doubt among American citizens, and before an American tribunal, it is that of illegal taxation. A celebrat ed writer has observed, that every illegal tax, is, in fact, a revolution ; and, indeed, what term can be applied to corporations, who exact money under false pretences ? What do courts with individuals, under similar circumstances; and where is the difference, in the eye of justice and morality, between an individual who obtains money under false pretences, and a corporation who exacts dues in violation of law and common right ? The subsequent disposition of the acquisition, is no excuse for the unlawful act. It is difficult to apprehend the existence of any obligation, natural, civil, or conventional, to comply with, or submit to such an exaction.

The laws provide for the defraying of all the expenses of the municipalities, and give them full powers to raise, by taxation on articles specified, any sum necessary for their wants. The tax on ships and steamers is already enormous, and abundantly sufficient to meet any expenditures for wharves; but if it were not, the taxable property of the inhabitants is there to meet any deficiency. The prohibition in the act of 1808, carries with it the nullity of any agreement made in violation of it. Its violation cannot enable a corporation to retain the money of the citizen, unlawfully exacted. Prohibitive laws import nullity, though the nullity be not formally expressed.

It is alleged that the plaintiffs paid the defendants' unjust demand in error. That error is one of law. " Error of law can

never be alleged as the means of acquiring, though it may be invoked as the means of preventing a loss, or *of receiving back what has been given, or paid under such error.*" Civil Code, art. 1840, sec. 3.

The authors of our Code have adopted the doctrine of D'Aguesseau and Vinnius, and settled the vexed question among the civilians, concerning errors of law.

In order to enable a party to recover, in this action, the first thing to be established, is, that the money paid was not due.

This had been put beyond all controversy. It is not pretended that the defendants had a lawful claim against the plaintiffs for one sous. The error of law is, therefore, palpable. The plaintiffs are then entitled to recover; for it is idle to suppose that a demand like this would be paid, except on the belief that it was due and could be exacted. Common sense repels the supposition. No body believes such a thing to be possible in an age like this, as that men would give voluntarily their money on such a demand. It is the arm of authority that really enforces the payment. For the purpose of avoiding the vexations of lawsuits, taxes are paid without question and without examination. The error being patent, it is incumbent on the defendants to rebut it by legal and competent proofs.

" The same presumption which throws on the plaintiff, *in repetition*, the proof that what he has paid was not due, throws on his opponent, when this fact has been once proved, the burthen of proving that the payment was made *knowingly*, and with the knowledge that what was paid was not due." 5 Toullier, § 70, b. 91, 92, 93.

Have the defendants proved this? Is there a *scintilla* of evidence on the subject? Is there any ground for assuming that the plaintiffs knew the law, and knew that the attempted exaction was without right or authority, and paid under such knowledge?

But suppose the plaintiffs were in doubt on the subject; if they paid what was not due, they still can recover the money back. *Nemo presumitur donare.* If there be any doubt as to whether the party paying, knew that what was demanded was not due, the money can be recovered back. 5 Toul. 71.

The ancient jurisconsults thought otherwise ; but Justinian established the principle. *The knowledge of the non-indebtedness,* on the part of the debtor, must be proved as a substantive fact ; if he were in doubt, the money must be returned. There are few cases which can be made clearer by authority, than that under consideration. No argument can avail in such a case ; the law is plain, positive, and free from any adverse interpretation. The principle, that an illegal tax can be recovered back, is almost a necessary one in a republic, and founded upon the fundamental notions of common justice. It is doubly necessary in the case of a corporation, exacting money under the semblance of an authority ; and still more so, when the receiving the tax is in violation of a penal statute, and subjects the recipient to a criminal prosecution. Vide 11 Merlin, Rep., *Restitution de droits indument percus.* 809.

It is very difficult to understand on what ground the idea is based, that there was a *natural obligation,* on the part of persons landing goods from the river, to pay for the use of the bank, or of any part or portion of it.

As far as the law of nature is concerned, independent of civil law, rivers are free for the use of man ; and it is in violation of that law, that any thing is exacted from the fisherman who dries his net on the bank, or for any other use of it. If obligation and duty be reciprocal, can it be said that it is the duty of a citizen to pay for landing goods, or that any such obligation, of any kind or species soever, exists on his part ? On the contrary, it is his duty not to pay. The banks of rivers are free by the law of nature ; they are free by our civil law, and a penalty is enacted against any infringement of their freedom. It is by this freedom that the public interest is promoted ; it is for the general weal that they are kept free, and any encroachment on their freedom is in derogation of public order, as well as of common right. But the goods have paid one duty in the vessel dues, and will bear their portion of the real estate tax when they are stored ; and can there be any thing like a moral duty on the owner to submit to this additional exaction. It was the duty of the municipalities to provide suitable and proper means for the landing of goods. The exigencies of com-

merce, and their own interest command it; they receive an equivalent, and more, in the tax on vessels, for any expense they may be at in giving conveniencies for the landing of the goods; and they are compensated a thousand fold in the prosperity of commerce, and the consequent advantage to the metropolis.

But how can a court give effect to a natural obligation, if a compliance with it is made penal? Had the officers of the corporation, who received this exaction, been prosecuted for a violation of the statute, they must have been punished for it. By permitting this unlawfully exacted tax to be retained, the court sanctions an act which, in the court-room under them, would be punished as an offence.

*W. S. Upton*, in support of the application for a re-hearing. The burden of proof was upon the defendants, to show that these payments were made " *knowingly*," or " *voluntarily*;" that they were " *civilly or naturally due*," or " *made from some reason of general policy*."

Let us recur to the articles in the Civil Code, upon which the plaintiffs rely. " He who receives what is not due him, whether he receives it through error, or knowingly, obliges himself to restore it to him from whom he has unduly received it." Art. 2279. This article is particularly urged upon the attention of the court; it is not cited in the judgment, and may have escaped observation. The two following articles were cited, viz: 2280, 2281. " He who has paid through mistake, believing himself a debtor, may reclaim what he has paid." " To acquire this right, it is necessary that the thing be not due, in any manner, either civilly or naturally. A natural obligation to pay, will be sufficient to prevent the recovery." " A thing not due, is that which is paid *on the supposition* of an obligation which *did not exist*, or from which a person has been released." C. C. 2282.

The case of the bridge, stated by the court, assumes the very matter in dispute. There is no evidence—nothing, whatsoever, in the record, to prove any willingness, on the part of the plaintiffs to pay the sums which they here seek to reclaim— no evidence, whatsoever, of voluntary payment. It was in-

DECEMBER, 1844. 345

Worsley and another v. The Second Municipality of New Orleans.

cumbent on the defendants to show this. What says Toullier? (Tit. IV. Des Quasi-contrats.) "Ces deux preuves sont nécessaires pour faire réussir une demande en répétition; mais la preuve que la chose n'était pas due fait le plus souvent présumer qu'elle a été payée par erreur, et cette présomption dispense le demandeur en répétition de cette dernière preuve, parceque la présomption de donation que pourrait faire naître la circonstance d'un paiement fait sciemment, avec connaissance que la chose n'était pas due, se trouve alors balancée et détruite par une autre présomption plus forte, celle que personne n'est présumé donner lorsqu'il ne doit pas, et que le paiement peut avoir eu une autre cause, telle que l'erreur." Toul. II., 69.

"Ainsi, la même présomption que rejette sur le demandeur en répétition la preuve que la chose qu'il a payée n'est pas due, *rejette sur son adversaire,* lorsque cette preuve est une fois faite, *le fardeau de prouver* que le paiement a été fait sciemment, et avec connaissance que la chose *n'était pas due,*" Toullier II., Nos. 70, 71.

There was no voluntary payment by the plaintiffs. So far from any voluntary payment of what the court does not hesitate, in its judgment, to call an " *exaction*"—a " *coercion*," it is notorious that the defendants resorted to the petty tribunals of the associate judges of the City Court, to coerce such payment, whenever it was refused; all of which sustained the right of the defendants to exact the tax.

The principle of equity, so correctly applied in the case of the tobacco inspectors, cited by the court, is inapplicable to this case. In that case, there was an express contract, on the part of the plaintiffs, to pay the sum reclaimed, as an extra charge. There was no pretence of error. The rule, *si sciens se non debere solvit, cessat repetitis,* applied there; but is inapplicable to this case, in which the plaintiffs paid under the belief that they were bound to do so.

*Re-hearing refused.*